(Slip Opinion)

# April 2018 Airstrikes Against Syrian Chemical-Weapons Facilities

The President could lawfully direct airstrikes on facilities associated with Syria's chemical-weapons capability because he had reasonably determined that the use of force would be in the national interest and that the anticipated hostilities would not rise to the level of a war in the constitutional sense.

May 31, 2018

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

On April 13, 2018, the President directed the United States military to launch airstrikes against three facilities associated with the chemical-weapons capability of the Syrian Arab Republic ("Syria"). The President's direction was consistent with many others taken by prior Presidents, who have deployed our military forces in limited engagements without seeking the prior authorization of Congress. This deeply rooted historical practice, acknowledged by courts and Congress, reflects the well-established division of war powers under our Constitution. Prior to the Syrian operation, you requested our advice on the President's authority. Before the strikes occurred, we advised that the President could lawfully direct them because he had reasonably determined that the use of force would be in the national interest and that the anticipated hostilities would not rise to the level of a war in the constitutional sense. This memorandum explains the bases for our conclusion.

## I.

On April 7, 2018, the Syrian regime used chemical weapons in the eastern Damascus suburb of Duma. *United States Government Assessment of the Assad Regime's Chemical Weapons Use* (Apr. 13, 2018) ("*USG Assessment*"), https://www.whitehouse.gov/briefings-statements/united-states-government-assessment-assad-regimes-chemical-weapons-use/. At the time, the intelligence community had assessed that the regime carried out this attack with chlorine gas and perhaps with the nerve agent sarin as well. *Briefing by Secretary Mattis on U.S. Strikes in Syria* (Apr. 13, 2018) ("*Mattis Briefing*"), https://www.defense.gov/News/Transcripts/Transcript-View/Article/1493658/briefing-by-secretary-mattis-on-us-strikes-in-syria/. The attack, part of a weeks-long offensive by the regime, killed dozens of inno-

cent men, women, and children, and injured hundreds. *USG Assessment*. In this use of chemical weapons, the regime sought to "terrorize and subdue" the civilian population, as well as opposition fighters. *Id*.

The Syrian government's latest use of chemical weapons followed a string of other chemical-weapons attacks. The regime used sarin in November 2017 in the suburbs of Damascus and in an April 2017 attack on Khan Shaykhun. *Id.* It also dropped chlorine bombs three times in just over a week last spring and launched at least four chlorine rockets in January in Duma. *Id*. The U.S. government has assessed that the regime used chemical weapons on many other occasions—it has identified more than fifteen chemical-weapons uses since June 2017 in the suburb of East Ghutah alone—and believes that the regime, unless deterred, will continue to make use of such weapons. *Id*.

On April 13, 2018, in coordination with the United Kingdom and France, the United States attacked three facilities associated with Syria's use of chemical weapons: the Barzeh Research and Development Center, the Him Shinshar chemical-weapons storage facility, and the Him Shinshar chemical-weapons bunker facility. *Department of Defense Press Briefing by Pentagon Chief Spokesperson Dana W. White and Joint Staff Director Lt. Gen. Kenneth F. McKenzie Jr. in the Pentagon Briefing Room* (Apr. 14, 2018) (statement of Lt. Gen. McKenzie) ("*DoD Briefing*"), https://www.defense.gov/ News/Transcripts/Transcript-View/Article/1493749/department-of-defense-press-briefing-by-pentagon-chief-spokesperson-dana-w-whit/. The Barzeh Center was used for the research, development, production, and testing of chemical and biological weapons. *Mattis Briefing* (statement of Gen. Dunford). The Him Shinshar sites were a chemical-weapons storage facility assessed to be the primary location of Syrian sarin-production equipment, as well as a chemical-weapons storage facility and an important command post. *Id*. In total, the United States launched 105 missiles from naval platforms in the Red Sea, the Northern Arabian Gulf, and the Eastern Mediterranean. *DoD Briefing* (statement of Lt. Gen. McKenzie). The missiles all hit their targets within a few minutes of each other, although the full operation lasted several hours. *Id*.

The United States deconflicted the airspace with Russia in advance and selected the sites to reduce the risk of hitting Russian forces. *DoD Briefing* (statement of Lt. Gen. McKenzie); *Mattis Briefing* (statement of Gen. Dunford). The strikes were timed to hit their targets around 4 a.m. local time to reduce casualties. *DoD Briefing* (statement of Lt. Gen. McKenzie). The sites

were chosen to minimize collateral damage, while inflicting damage on the chemical-weapons program. *Id.* ("[T]hese are the targets that presented the best opportunity to minimize collateral damage, to avoid killing innocent civilians, and yet to send a very strong message."); *Mattis Briefing* (statement of General Dunford) ("[W]e chose these particular targets to mitigate the risk of civilian casualties, number one. We chose these targets because they were specifically associated with the chemical program . . . . So these targets were carefully selected with proportionality[,] discrimination and being specifically associated with the chemical program.").

The allied attacks followed a limited U.S. strike in April 2017, in the wake of Syria's use of sarin against civilians in Khan Shaykhun. At that time, the United States responded with fifty-eight missiles aimed at the Shayrat airfield, which damaged or destroyed Syrian fuel and ammunition sites, air defense capabilities, and twenty percent of the Syrian Air Force's operational aircraft. Remarks on United States Military Operations in Syria, 2018 Daily Comp. Pres. Doc. 201800242, at 1 (Apr. 13, 2018) ("*Remarks on Syria Operations*"); *Statement by Secretary of Defense Jim Mattis on the U.S. Military Response to the Syrian Government's Use of Chemical Weapons* (Apr. 10, 2017), https://www.defense.gov/News/News-Releases/News-Release-View/Article/1146758/statement-by-secretary-of-defense-jim-mattis-on-the-us-military-response-to-the/source/GovDelivery/. While the April 2017 strike targeted the airfield from which the Syrian regime delivered the weapons, the 2018 attacks were focused on the long-term degradation of Syria's capability to research, develop, and use chemical and biological weapons. *Mattis Briefing* (statement of Gen. Dunford).

## II.

When it comes to the war powers of the President, we do not write on a blank slate. The legal opinions of executive advisers and the still weightier precedents of history have established that the President, as Commander in Chief and Chief Executive, has the constitutional authority to deploy the military to protect American persons and interests without seeking prior authorization from Congress. *See, e.g.*, *The President and the War Power: South Vietnam and the Cambodian Sanctuaries*, 1 Op. O.L.C. Supp. 321, 331 (May 22, 1970) ("*Cambodian Sanctuaries*"); *Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 62 (1941) (Jackson, A.G.) ("*British Flying Students*"). The President's authority in this area has been elucidated by dozens of occasions over the course of 230 years, quite

literally running from the halls of Montezuma to the shores of Tripoli and beyond.[1] Many of those actions were approved by opinions of this Office or of the Attorney General, and many involved engagements considerably broader than the April 2018 Syrian strikes. The Constitution reserves to Congress the authority to "declare War" and thereby to decide whether to commit the Nation to a sustained, full-scale conflict with another Nation. Yet Presidents have repeatedly engaged in more limited hostilities to advance the Nation's interests without first seeking congressional authorization.

The President's authority to direct U.S. military forces arises from Article II of the Constitution, which makes the President the "Commander in Chief of the Army and Navy of the United States," U.S. Const. art. II, § 2, cl. 1, and vests in him the Executive Power, *id.* art. II, § 1, cl. 1. These powers allow him "to direct the movements of the naval and military forces placed by law at his command." *Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850). Chief Justice Marshall suggested that the President's "high duty" to "'take care that the laws be faithfully executed,'" as well as his power as

---

[1] After receiving an ultimatum from the Bey of Tripoli in May 1801, President Jefferson dispatched U.S. ships to the Mediterranean with orders, in the event the Barbary Powers declared war, to "distribute your force . . . so as best to protect our commerce & chastise their insolence—by sinking, burning or destroying their ships & Vessels wherever you shall find them." David P. Currie, *The Constitution in Congress: The Jeffersonians, 1801–1829*, at 127–28 (2001). After Tripoli declared war, the United States launched a surprise attack on a Tripolitan vessel. *Id.* at 128. In reporting the action to Congress, Jefferson elided the offensive nature of the attack and sought authorization to "go beyond the line of defense," *id.* at 124, 128, which Congress granted on February 6, 1802. *See* Act of Feb. 6, 1802, ch. IV, § 2, 2 Stat. 129, 130.

After Congress annexed Texas, President Polk deployed the U.S. military 150 miles south of the disputed border with Mexico to the Rio Grande in June 1845. *See* David P. Currie, *The Constitution in Congress: Descent into the Maelstrom, 1829–1861*, at 102 (2005); 4 *A Compilation of the Messages and Papers of the Presidents, 1788–1897*, at 437, 440 (James D. Richardson ed., 1897); *see also Cambodian Sanctuaries*, 1 Op. O.L.C. Supp. at 327. After active hostilities commenced, Congress declared war. *See* Act of May 13, 1846, ch. XVI, 9 Stat. 9 (1846); *see also The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1863) ("The battles of Palo Alto and Resaca de la Palma had been fought before the passage of the Act of Congress of May 13th, 1846, which recognized 'a state of war as existing by the act of the Republic of Mexico.' This act not only provided for the future prosecution of the war, but was itself a vindication and ratification of the Act of the President in accepting the challenge without a previous formal declaration of war by Congress.").

Commander in Chief, imply some authority to deploy U.S. military force. *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 177 (1804). The Supreme Court has recognized that the President holds the "vast share of responsibility for the conduct of our foreign relations," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (internal quotation marks omitted), and holds "independent authority in the areas of foreign policy and national security," *id*. at 429 (internal quotation marks omitted); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) ("The Court also has recognized the generally accepted view that foreign policy [is] the province and responsibility of the Executive.") (internal quotation marks omitted). By its terms, Article II provides the President with the authority to direct U.S. military forces in engagements necessary to advance American national interests abroad.

In evaluating the division of authority between the President and Congress, the Supreme Court has placed "significant weight" on "accepted understandings and practice." *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2091 (2015); *see NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) (noting that "long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions regulating the relationship between Congress and the President" (internal quotation marks and alterations omitted)); *Dames & Moore v. Regan*, 453 U.S. 654, 678–86 (1981) (describing "a history of congressional acquiescence in conduct of the sort engaged in by the President"). We have recognized that "[s]ince judicial precedents are virtually non-existent" in defining the scope of the President's war powers, "the question is one which of necessity must be decided by historical practice." *Presidential Authority to Permit Incursion Into Communist Sanctuaries in the Cambodia-Vietnam Border Area*, 1 Op. O.L.C. Supp. 313, 317 (May 14, 1970) ("*Vietnam Border Area*").

And that history points strongly in one direction. While our Nation has sometimes debated the scope of the President's war powers under the Constitution, his authority to direct U.S. forces in hostilities without prior congressional authorization is supported by a "long continued practice on the part of the Executive, acquiesced in by the Congress." *Cambodian Sanctuaries*, 1 Op. O.L.C. Supp. at 326; *see also Deployment of United States Armed Forces to Haiti*, 28 Op. O.L.C. 30, 31 (2004) ("*Haiti Deployment II*") ("History offers ample evidence for the proposition that the President may take military action abroad, even, as here, in the absence of specific prior congressional authorization."); *Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization*, 4A Op. O.L.C. 185, 187 (1980)

("*Presidential Power*") ("Our history is replete with instances of presidential uses of military force abroad in the absence of prior congressional approval.").

Presidents have exercised their authority to direct military operations without congressional authorization since the earliest days of the Republic. President Washington directed offensive operations against the Wabash Indians in 1790. *See* David P. Currie, *The Constitution in Congress: The Federalist Period, 1789–1801*, at 84 (1997) ("[B]oth Secretary [of War] Knox and [President] Washington himself seemed to think [the Commander in Chief] authority extended to offensive operations undertaken in retaliation for Indian atrocities."). As noted above, the Jefferson Administration instructed the United States Navy to "sink[], burn[] or destroy[]" Barbary cruisers. *See supra* note 1; *see also Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 9 (1992) ("*Somalia Deployment*"). These past deployments have included President Truman's defense of South Korea; President Kennedy's introduction of U.S. forces into Vietnam; President Reagan's retaliatory strikes on Libya following the Beirut bombing; President George H.W. Bush's introduction of U.S. troops into Somalia; President Clinton's actions in Bosnia, Haiti, Kosovo, Sudan, and Afghanistan; President George W. Bush's intervention in Haiti; and President Obama's airstrikes in Libya and in Houthi-controlled territory in Yemen.

While the precise counting varies, by the middle of the twentieth century, scholars had identified well over 100 instances of military deployments without prior congressional authorization. *See Proposed Deployment of United States Armed Forces into Bosnia*, 19 Op. O.L.C. 327, 331 (1995) ("*Bosnia Deployment*") ("In at least 125 instances, the President acted without express authorization from Congress."); William Gabriel Carras, *The Analysis and Interpretation of the Use of Presidential Authority to Order United States Armed Forces into Military Action in Foreign Territories Without a Formal Declaration of War* 369 (1959) (identifying 124 of 141 military deployments between 1798 and 1956); James Grafton Rogers, *World Policing and the Constitution* 93–123 (1945) (identifying 119 of 149 military deployments between 1798 and 1941). In the forty-five years since the 1973 enactment of the War Powers Resolution, Pub. L. No. 93-148, 87 Stat. 555, Presidents have submitted more than eighty reports of hostilities to Congress that did not rely upon statutory authorization. *See* Matthew C. Weed, Cong. Research Serv., R42699, *The War Powers Resolution: Concepts and Practice* 57–83 (Mar. 28, 2017). From the border of the Rio

Grande to the thirty-eighth parallel on the Korean peninsula, from the Gulf of Tonkin to the Shayrat Airfield, Presidents have acted, and Congress has accepted or ratified the President's use of the military, to advance our national interests.

As Assistant Attorney General Rehnquist observed, "[i]t is too plain" in view of this record "to admit of denial that the Executive, under his power as Commander in Chief, is authorized to commit American forces in such a way as to seriously risk hostilities, and also to actually commit them to such hostilities, without prior congressional approval." *Cambodian Sanctuaries*, 1 Op. O.L.C. Supp. at 331. That historical record has only expanded in the decades since Vietnam. Since then, in light of "repeated past practice under many Presidents," this Office has repeatedly advised that "the President has the power to commit United States troops abroad for the purpose of protecting important national interests." *Somalia Deployment*, 16 Op. O.L.C. at 9; *see also Authority to Use Military Force in Libya*, 35 Op. O.L.C. ___, at *6 (Apr. 1, 2011) ("*Libya Deployment*"), https://www.justice.gov/sites/default/files/olc/opinions/2011/04/31/authority-military-use-in-libya_0.pdf; *Haiti Deployment II*, 28 Op. O.L.C. at 31. Congress likewise acknowledged this authority in the War Powers Resolution, at least implicitly, by recognizing that the President may introduce U.S. forces into hostilities for up to sixty days or more without congressional authorization. 50 U.S.C. § 1544(b); *see also Deployment of United States Armed Forces into Haiti*, 18 Op. O.L.C. 173, 176 (1994) ("*Haiti Deployment I*").[2]

Although "[t]he limits of the President's power as Commander in Chief are nowhere defined in the Constitution," we have recognized a "negative

---

[2] The War Powers Resolution does not constitute an affirmative source of authority for the President to introduce U.S. forces into hostilities, 50 U.S.C. § 1547(d)(2), but it also is not "intended to alter the constitutional authority . . . of the President." *Id.* § 1547(d)(1). By seeking to require the cessation of hostilities within sixty days, absent congressional authorization, the statute assumes that the President has the authority to authorize such engagements. The statute begins with a statement of purpose and policy that identifies a narrow set of engagements that the President may direct without congressional authorization. *Id.* § 1541(c). Yet we have recognized that this policy statement neither affirmatively limits presidential authority nor constitutes an exhaustive list of the circumstances in which the President may use military force to protect important national interests. *See, e.g.*, *Overview of the War Powers Resolution*, 8 Op. O.L.C. 271, 274 (1984); *see also Authority of the President Under Domestic and International Law to Use Military Force Against Iraq*, 26 Op. O.L.C. 143, 159–61 (2002) (summarizing the Executive Branch's longstanding constitutional concerns with the War Powers Resolution).

implication from the fact that the power to declare war is committed to Congress." *Cambodian Sanctuaries*, 1 Op. O.L.C. Supp. at 325. The Constitution reserves to Congress the power to "declare War," U.S. Const. art. I, § 8, cl. 11, and the authority to fund military operations, *id*. art. I, § 8, cl. 12. This was a deliberate choice of the Founders, who sought to prevent the President from bringing the Nation into a full-scale war without the authorization of Congress. *See, e.g.*, *The Federalist* No. 69, at 465 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (recognizing that the President lacks the authority of the British King, which "extends to the *declaring* of war and to the *raising* and *regulating* of fleets and armies; all which by the Constitution under consideration would appertain to the Legislature"); 4 Jonathan Elliot, *The Debates in the Several State Conventions of the Adoption of the Federal Constitution* 107–08 (2d ed. 1836) (James Iredell, speaking at the North Carolina Ratifying Convention) ("The President has not the power of declaring war by his own authority, nor that of raising fleets and armies. These powers are vested in other hands. The power of declaring war is expressly given to Congress, that is, to the two branches of the legislature . . . . They have also expressly delegated to them the powers of raising and supporting armies, and of providing and maintaining a navy."); *United States v. Smith*, 27 F. Cas. 1192, 1230 (C.C.D.N.Y. 1806) (No. 16,342) ("[I]t is the exclusive province of congress to change a state of peace into a state of war."). These legislative powers ensure that the use of force "cannot be sustained over time without the acquiescence, indeed the approval, of Congress, for it is Congress that must appropriate the money to fight a war or a police action." *Presidential Power*, 4A Op. O.L.C. at 188. These powers further oblige the President to seek congressional approval prior to contemplating military action that would bring the Nation into a war.

Not every military operation, however, rises to the level of a war. Rather, "the historical practice of military action without congressional approval precludes any suggestion that Congress's authority to declare war covers every military engagement, however limited, that the President initiates." *Libya Deployment* at *8. Early on, the Supreme Court distinguished between a declared war (which arises where "one whole nation is at war with another whole nation" with hostilities arising "in every place, and under every circumstance") and a more limited engagement, an "*imperfect war*" (in which hostilities are "more confined in its nature and extent; being limited as to places, person and things"). *Bas v. Tingy*, 4 U.S. (4 Dall.) 37, 40–41

(1800).[3] Consistent with that early recognition, we have repeatedly distinguished between limited hostilities and "prolonged and substantial military engagements, typically involving exposure of U.S. military personnel to significant risk over a substantial period." *Libya Deployment* at *8.

When reviewing proposed military engagements, this Office has recognized that "a planned military engagement that constitutes a 'war' within the meaning of the Declaration of War Clause may require prior congressional authorization." *Id.*; *see also Cambodian Sanctuaries*, 1 Op. O.L.C. Supp. at 331–32 ("[I]f the contours of the divided war power contemplated by the framers of the Constitution are to remain, constitutional practice must include executive resort to Congress in order to obtain its sanction for the conduct of hostilities which reach a certain scale."); *Vietnam Border Area*, 1 Op. O.L.C. Supp. at 317 ("Under our Constitution it is clear that Congress has the sole authority to declare formal, all-out war."). We have therefore considered the scale of the expected hostilities in analyzing whether a proposed engagement would constitute a war for constitutional purposes. *See Libya Deployment* at *8–9; *Haiti Deployment I*, 18 Op. O.L.C. at 177–78.

### III.

We now explain our analysis of the April 13, 2018 Syrian strikes in light of our precedents. In evaluating whether a proposed military action falls within the President's authority under Article II of the Constitution, we have distilled our precedents into two inquiries. First, we consider whether the President could reasonably determine that the action serves important national interests. *See, e.g.*, *Somalia Deployment*, 16 O.L.C. at 9 ("At the core of this power is the President's authority to take military action to protect

---

[3] *Bas* concerned the Quasi-War with France, which involved hostilities that Congress had authorized by statute without a formal declaration of war. *See Treason*, 1 Op. Att'y Gen. 84, 84 (1798) ("Having taken into consideration the acts of the French republic relative to the United States, and the laws of Congress passed at the last session, it is my opinion that there exists not only an *actual* maritime war between France and the United States, but a maritime war *authorized* by both nations."). We do not suggest that every "imperfect war" falls within the sphere of unilateral executive action. As with the Quasi-War, Congress may authorize the use of force in such conflicts, and we do not rule out that some imperfect wars may involve such prolonged and substantial engagements as to require that authorization. Our point though is that the early Supreme Court recognized the distinction between wars that must be declared under Article I, Section 8 of the Constitution and more limited military engagements—many of which have not traditionally been authorized by Congress.

American citizens, property, and interests from foreign threats."); *British Flying Students*, 40 Op. Att'y Gen. at 62 ("[T]he President's authority has long been recognized as extending to the dispatch of armed forces outside of the United States, either on missions of good will or rescue, or for purposes of protecting American lives or property or American interests."). Second, we consider whether the "anticipated nature, scope and duration" of the conflict might rise to the level of a war under the Constitution. *See Libya Deployment* at *9 (quoting *Haiti Deployment I*, 18 Op. O.L.C. at 179). Prior to the Syrian strikes, we applied this framework to conclude that the proposed Syrian operation would fall within the President's constitutional authority.

## A.

This Office has recognized that a broad set of interests would justify use of the President's Article II authority to direct military force. These interests understandably grant the President a great deal of discretion. The scope of U.S. involvement in the world, the presence of U.S. citizens across the globe, and U.S. leadership in times of conflict, crisis, and strife require that the President have wide latitude to protect American interests by responding to regional conflagrations and humanitarian catastrophes as he believes appropriate. The Commander in Chief bears great responsibility for the use of the armed forces and for putting U.S. forces in harm's way. We would not expect that any President would use this power without a substantial basis for believing that a proposed operation is necessary to advance important interests of the Nation. The aim of this inquiry is not to evaluate the worth of the interests at stake—a question more of policy than of law—but rather, to set forth the justifications for the President's use of military force and to situate those interests within a framework of prior precedents.

In our past opinions, this Office has identified a number of different interests that have supported sending U.S. forces into harm's way, including the following:

- the protection of U.S. persons and property, *see, e.g.*, *Presidential Power*, 4A Op. O.L.C. at 187 ("Presidents have repeatedly employed troops abroad in defense of American lives and property."); *Haiti Deployment II*, 28 Op. O.L.C. at 31 ("The President has the authority to deploy the armed forces abroad in order to protect American citizens and interests from foreign threats.");

- assistance to allies, *see, e.g.*, *Haiti Deployment I*, 18 Op. O.L.C. at 79 (approving of intervention "at the invitation of a fully legitimate government"); *Presidential Power*, 4A Op. O.L.C. at 187–88 (citing the Korean War as "precedent . . . for the commitment of United States armed forces, without prior congressional approval or declaration of war, to aid an ally in repelling an armed invasion");

- support for the United Nations, *see, e.g.*, *Haiti Deployment II*, 28 Op. O.L.C. at 33 ("Another American interest in Haiti arises from the involvement of the United Nations in the situation there."); *Somalia Deployment*, 16 Op. O.L.C. at 11 ("[M]aintaining the credibility of United Nations Security Council decisions, protecting the security of United Nations and related relief efforts, and ensuring the effectiveness of United Nations peacekeeping operations can be considered a vital national interest[.]"); and

- promoting regional stability, *see, e.g.*, *Haiti Deployment II*, 29 Op. O.L.C. at 32 ("The President also may determine that the deployment is necessary to protect American foreign policy interests. One such interest is the preservation of regional stability."); *Libya Deployment* at *12 ("[W]e believe the President could reasonably find a significant national security interest in preventing Libyan instability from spreading elsewhere in this critical region.").

In recent years, we have also identified the U.S. interest in mitigating humanitarian disasters. *See* Memorandum Opinion for the Counsel to the President, from Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Authority to Use Military Force in Iraq* at 20–24 (Dec. 30, 2014) ("*Iraq Deployment*"). With respect to Syria, in April 2017, the President identified the U.S. interest in preventing the use and proliferation of chemical weapons, *see* Letter to Congressional Leaders on United States Military Operations in Syria, 2017 Daily Comp. Pres. Doc. 201700244, at 1 (Apr. 8, 2017) ("2017 Congressional Notification"). As explained below, these interests too are consistent with those that the President and his advisers have relied upon in the past.

The President identified three interests in support of the April 2018 Syria strikes: the promotion of regional stability, the prevention of a worsening of the region's humanitarian catastrophe, and the deterrence of the use and proliferation of chemical weapons. *See* Letter to Congressional Leaders on United States Military Operations in Syria, 2018 Daily Comp. Pres. Doc. 201800243, at 1 (Apr. 15, 2018). Prior to the attack, we advised that the

President could reasonably rely on these national interests to authorize air strikes against particular facilities associated with Syria's chemical-weapons program without congressional authorization.

As discussed above, Presidents have deployed U.S. troops on multiple occasions in the interest of promoting regional stability and preventing the spread of an ongoing conflict. While the United States is not the world's policeman, as its power has grown, the breadth of its regional interests has expanded and threats to national interests posed by foreign disorder have increased. *See, e.g.*, *Authority of the President to Repel the Attack in Korea*, 23 Dep't of State Bull. 173, 175 (1950) ("*Attack in Korea*") (quoting Secretary of State Hay's statement that President McKinley dispatched troops to China during the Boxer rebellion in part to "prevent a spread of the disorders"); Clarence W. Berdahl, *War Powers of the Executive of the United States* 53–55 (1921) (describing numerous instances of the deployment of troops to secure stability in the Caribbean). This Office has consistently recognized that U.S. national interests in regional stability may support military intervention. *See Haiti Deployment II*, 28 Op. O.L.C. at 32 ("The President also may determine that the deployment is necessary to protect American foreign policy interests. One such interest is the preservation of regional stability."); *Bosnia Deployment*, 19 Op. O.L.C. at 332–33 ("[Military deployment] would serve significant national security interests, by preserving peace in the region and forestalling the threat of a wider conflict."); *Libya Deployment* at *10 (concluding the combination of interests in "preserving regional stability and supporting the [United Nation Security Council's] credibility and effectiveness" were a "sufficient basis for the President's exercise of his constitutional authority to order the use of military force").

Here, the President could reasonably determine that Syria's use of chemical weapons in the ongoing civil war threatens to undermine further peace and security of the Near East, a region that remains critically important to our national security. Syria's possession and use of chemical weapons have increased the risk that others will gain access to them. *See* Daniel R. Coats, Director of National Intelligence, Statement for the Record: Worldwide Threat Assessment of the US Intelligence Community at 7 (Feb. 13, 2018), https://www.dni.gov/files/documents/Newsroom/Testimonies/2018-ATA---Unclassified-SSCI.pdf ("*Worldwide Threat Assessment*") ("Biological and chemical materials and technologies—almost always dual-use—move easily in the globalized economy, as do personnel with the scientific expertise to

design and use them for legitimate and illegitimate purposes."). The proliferation of such weapons to other countries with fragile governments or to terrorist groups could further spread conflict and disorder within the region. *See* Council on Foreign Relations, A Conversation with Nikki Haley (Mar. 29, 2017), https://www.cfr.org/event/conversation-nikki-haley ("Let's really look at the fact that if we don't have a stable Syria, we don't have a stable region."); Remarks to the United Nations General Assembly in New York City, 2017 Daily Comp. Pres. Doc. 201700658, at 5 (Sept. 19, 2017), ("No society can be safe if banned chemical weapons are allowed to spread."); United States Mission to the United Nations, Ambassador Haley Delivers Remarks at a UN Security Council Meeting on Nonproliferation (Jan. 18, 2018), https://usun.state.gov/highlights/8276 ("The regimes that most threaten the world today with weapons of mass destruction are also the source of different kinds of security challenges. They deny human rights and fundamental freedoms to their people. They promote regional instability. They aid terrorists and militant groups. They promote conflict that eventually spills over its borders."). The United States has a direct interest in ensuring that others in the region not look to Syria's use of chemical weapons as a successful precedent for twenty-first-century conflicts.

Moreover, the regime's use of chemical weapons is a particularly egregious part of a broader destabilizing conflict. The civil war in Syria directly empowered the growth of the Islamic State of Iraq and Syria ("ISIS"), a terrorist threat that has required the deployment of over 2,000 U.S. troops. *See* Jim Garmone, DoD News, Defense Media Activity, *Pentagon Announces Troop Levels in Iraq, Syria* (Dec. 6, 2017), https://www.defense.gov/News/Article/Article/1390079/pentagon-announces-troop-levels-in-iraq-syria/.[4] The instability in Syria has had a direct and marked impact upon the national security of close American allies and partners, including Iraq, Israel, Jordan, Lebanon, and Turkey, all of which border Syria and have had to deal with unrest from the conflict. Rand Corporation, Research Brief, *The Conflict in Syria: Understanding and Avoiding Regional Spillover Effects* at 1 (2014), https://www.rand.org/content/dam/rand/pubs/research_briefs/RB9700/RB9785/RAND_RB9785.pdf; *see also generally* Leïla Vignal, *The*

---

[4] The U.S. deployment against ISIS is supported by congressional authorization pursuant to the 2001 Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224, and the Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498. U.S. actions to counter ISIS in Syria are therefore based upon a different legal footing than are the attacks against Syria's chemical-weapons facilities.

*Changing Borders and Borderlands of Syria in a Time of Conflict*, 93 Int'l Affairs 809 (2017). In addition, the power vacuum in Syria has provided an opportunity for Russia and Iran to deepen their presence in the region and engage in activities that have had a directly adverse impact on the interests and security of the United States and its allies in the area. *See* President Donald J. Trump, National Security Strategy of the United States of America at 49 (Dec. 2017), https://www.whitehouse.gov/wp-content/uploads/2017/12/NSS-Final-12-18-2017-0905.pdf ("Rival states are filling vacuums created by state collapse and prolonged regional conflict.").

The Syrian regime's continued attacks on civilians have also contributed to the displacement of civilians and thus deepened the instability in the region. According to the Director of National Intelligence, as of October 2017, more than 5 million Syrian refugees had fled to neighboring countries and more than 6 million were displaced internally. *See Worldwide Threat Assessment* at 21; *see also* Arwa Damon and Gul Tuysuz, CNN, *Survivors of a Chemical Attack in Syria Tell Their Stories for the First Time* (Apr. 16, 2018), https://www.cnn.com/2018/04/15/middleeast/douma-chemical-attack-survivors-stories-arwa-damon-intl/index.html (interviewing individuals at a refugee camp who survived the chemical-weapons attack on Douma). These large-scale population movements have added to unrest throughout the region. *Cf. Libya Deployment* at *11 (explaining that the flight of civilians to neighboring countries was "destabilizing the peace and security of the region" (internal quotation marks omitted)).

In directing the strikes, the President also relied on the national interest in mitigating a humanitarian crisis. In analyzing proposed military operations in Iraq designed to prevent genocidal acts against the Yazidis and otherwise to protect civilians at risk, we advised that humanitarian concerns could provide a basis for the President's use of force under his constitutional authority. *See Iraq Deployment* at 20–24. Given the role of the United States in the international community and the humanitarian interests of its people, Presidents have on many occasions deployed troops to prevent or mitigate humanitarian disasters. *See, e.g.*, Letter to Congressional Leaders on Deployment of United States Armed Forces to Haiti (Sept. 18, 1994), 2 *Pub. Papers of Pres. William J. Clinton* 1572, 1572 (1994) ("The deployment of U.S. Armed Forces into Haiti is justified by United States national security interests" including "stop[ping] the brutal atrocities that threaten tens of thousands of Haitians"); Letter to Congressional Leaders Reporting on the Commencement of Military Operations Against Libya (Mar. 21, 2011),

1 *Pub. Papers of Pres. Barack Obama* 280, 280 (2011) (notifying Congress of the commencement of operations "to prevent a humanitarian catastrophe").

In some cases, humanitarian concerns have been a significant, or even the primary, interest served by U.S. military operations. In 1992, when President George H.W. Bush announced that he had ordered the deployment of "a substantial American force" to Somalia during a widespread famine, he described it as "a mission that can ease suffering and save lives." Address to the Nation on the Situation in Somalia (Dec. 4, 1992), 2 *Pub. Papers of Pres. George Bush* 2174, 2174–75 (1992–93); *see also id.* at 2175 ("Let me be very clear: Our mission is humanitarian[.]"); *Somalia Deployment*, 16 Op. O.L.C. at 6 ("I am informed that the mission of those troops will be to restore the flow of humanitarian relief to those areas of Somalia most affected by famine and disease[.]"). Similarly, military intervention in Bosnia included the establishment of a no-fly zone, maintained for roughly two-and-a-half years, in support of a humanitarian air drop. Daniel L. Haulman, *The United States Air Force and Bosnia, 1992–1995*, Air Power History 24, 35 (2013); Letter to Congressional Leaders Reporting on the No-Fly Zone in Bosnia-Herzegovina (Oct. 13, 1993), 2 *Pub. Papers of Pres. William J. Clinton* 1740, 1741 (1993) ("[T]he no-fly zone enforcement operations have been militarily effective and have reduced potential air threats to our humanitarian airlift and airdrop flights."); Address Before a Joint Session of the Congress on the State of the Union (Jan. 25, 1994), 1 *Pub. Papers of Pres. William J. Clinton* 126, 132 (1994) (noting the continuation of the "longest humanitarian air lift in history in Bosnia"); Address to the Nation on Implementation of the Peace Agreement in Bosnia-Herzegovina (Nov. 27, 2995), 2 *Pub. Papers of Pres. William J. Clinton* 1784, 1785 (1995) ("We used our airpower to conduct the longest humanitarian airlift in history and to enforce a no-fly zone that took the war out of the skies.") ("*Clinton Address to the Nation*"). President Clinton also framed U.S. peacekeeping efforts in humanitarian terms. *Clinton Address to the Nation* at 1784 ("In fulfilling this mission, we will have the chance to help stop the killing of innocent civilians, especially children[.]").

The Syrian regime's use of chemical weapons has contributed to the ongoing humanitarian crisis in Syria. As discussed above, civilians fleeing from the strikes become refugees needing assistance. *See* Carla E. Humud et al., Cong. Research Serv., RL33487, *Armed Conflict in Syria: Overview and U.S. Response* 19 (Apr. 18, 2018) (explaining that 13.1 million people in

Syria were in need of humanitarian assistance as of early 2018, more than two-thirds of the country's 18 million people). Internally displaced persons in Syria often lack access to basic services or medical care, *see* World Health Organization, *Syrian Arab Republic Humanitarian Response Plan 2018*, http://www.who.int/emergencies/response-plans/2018/syria/en/ (last visited May 30, 2018), difficulties that are heightened for victims of chemical-weapons attacks. But even where the attacks do not displace civilians, the nature of chemical weapons alone makes their use a humanitarian issue. *See Remarks on Syria Operations* at 1 ("The evil and the despicable attack left mothers and fathers, infants and children, thrashing in pain and gasping for air. These are not the actions of a man; they are crimes of a monster instead."). As the President explained after the Syrian strike, "[c]hemical weapons are uniquely dangerous not only because they inflict gruesome suffering, but because even small amounts can unleash widespread devastation." *Id.*

In carrying out these strikes, the President also relied on the national interest in deterring the use and proliferation of chemical weapons. The President previously relied upon this interest in ordering the April 2017 airstrike in response to the attack on Khan Shaykhun. *See* 2017 Congressional Notification (stating that the President directed a strike on the Shayrat military airfield to "degrade the Syrian military's ability to conduct further chemical weapons attacks and to dissuade the Syrian regime from using or proliferating chemical weapons, thereby promoting the stability of the region and averting a worsening of the region's current humanitarian catastrophe"). While we are unaware of prior Presidents justifying U.S. military actions based on this interest as a matter of domestic law, we believe that it is consistent with those that have justified previous uses of force. The United States has long and consistently objected to the use and proliferation of chemical weapons. *See* Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous, or Other Gases, and of Bacteriological Methods of Warfare, *adopted* June 17, 1925, 26 U.S.T. 571, 94 L.N.T.S. 65; The Axis Is Warned Against the Use of Poison Gas (June 8, 1948), *Pub. Papers of Pres. Franklin D. Roosevelt* 242, 243 (1943) ("Use of [chemical] weapons has been outlawed by the general opinion of civilized mankind."). For nearly thirty years, Presidents have repeatedly declared the proliferation of chemical weapons to be a national emergency. *See* Notice Regarding the Continuation of the National Emergency with Respect to the Proliferation of Weapons of Mass Destruction, 82 Fed. Reg. 51,971 (Nov. 6, 2017) (most

recent order continuing in effect an emergency first declared in Executive Order 12735 of Nov. 16, 1990). In 1997, the United States ratified the Chemical Weapons Convention, which prohibits the use, development, production, and retention of chemical weapons. *See* Remarks on Senate Ratification of the Chemical Weapons Convention and an Exchange with Reporters (Apr. 24, 1997), 1 *Pub. Papers of Pres. William J. Clinton* 480, 480 (1997) (stating that ratification will permit the end of "a century that began with the horror of chemical weapons in World War I much closer to the elimination of those kinds of weapons"). And Congress cited Iraq's development of chemical weapons as one of the reasons in support of authorizing the use of military force against Iraq in 2002. *See* Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498, 1498 ("Whereas the efforts of international weapons inspectors, United States intelligence agencies, and Iraqi defectors led to the discovery that Iraq had large stockpiles of chemical weapons").

The United States has also repeatedly joined international condemnation of Syria's use of chemical weapons. *See, e.g.*, S.C. Res. 2319 (Nov. 17, 2016) ("*Condemning* again in the strongest terms any use of any toxic chemicals as a weapon in the Syrian Arab Republic and *expressing alarm* that civilians continue to be killed and injured by toxic chemicals as weapons in the Syrian Arab Republic"); S.C. Res. 2235 (Aug. 7, 2015) ("*Condemning* in the strongest terms any use of any toxic chemical as a weapon in the Syrian Arab Republic and *noting* with outrage that civilians continue to be killed and injured by toxic chemicals as weapons in the Syrian Arab Republic, *Reaffirming* that the use of chemical weapons constitutes a serious violation of international law, and *stressing* again that those individuals responsible for any use of chemical weapons must be held accountable"); S.C. Res. 2209 (Mar. 6, 2015) ("*Reaffirming* that the use of chemical weapons constitutes a serious violation of international law and *reiterating* that those individuals responsible for any use of chemical weapons must be held accountable"); S.C. Res. 2118 (Sept. 2017, 2013) ("*Determining* that the use of chemical weapons in the Syrian Arab Republic constitutes a threat to international peace and security").

Despite near-global condemnation, a small number of state and non-state actors persist in using chemical weapons, and Syria's continued use of them "threatens to desensitize the world to their use and proliferation, weaken prohibitions against their use, and increase the likelihood that additional states will acquire and use these weapons." *USG Assessment*. Last year's

U.S. strike did not fully dissuade the Syrian regime from continuing to use chemical weapons. And Russia recently used a nerve agent in an attempted assassination in the United Kingdom, "showing an uncommonly brazen disregard for the taboo against chemical weapons." *Id.*; *see also* United States Mission to the United Nations, *Ambassador Haley Delivers Remarks at a UN Security Council Briefing on Chemical Weapons Use in Syria* (Apr. 4, 2018), https://usun.state.gov/highlights/8366 ("When we let one regime off the hook, others take notice. The use of nerve agents in Salisbury and Kuala Lumpur proves this point and reveals a dangerous trend. We are rapidly sliding backward, crossing back into a world that we thought we left."). ISIS has also acquired and deployed chemical weapons. *See Worldwide Threat Assessment* at 8. The United States has a weighty interest in deterring the use of these weapons.

In sum, the President here was faced with a grave risk to regional stability, a serious and growing humanitarian disaster, and the use of weapons repeatedly condemned by the United States and other members of the international community. In such circumstances, the President could reasonably conclude that these interests provided a basis for airstrikes on facilities that support the regime's use of chemical weapons. *See Attack in Korea*, 23 Dep't of State Bull. at 174 ("The United States has, throughout its history, upon orders of the Commander in Chief to the Armed Forces and without congressional authorization, acted to prevent violent and unlawful acts in other states from depriving the United States and its nationals of the benefits of such peace and security."). We believe that these interests fall comfortably within those that our Office has previously relied upon in concluding that the President had appropriately exercised his authority under Article II, and we so advised prior to the Syrian strikes.

## B.

We next considered whether the President could expect the Syrian operations to rise to the level of a war requiring congressional authorization. Such a determination "requires a fact-specific assessment of the 'anticipated nature, scope, and duration' of the planned military operations." *Libya Deployment* at *8 (quoting *Haiti Deployment I*, 18 Op. O.L.C. at 179). As we have previously explained, military operations will likely rise to the level of a war only when characterized by "prolonged and substantial military engagements, typically involving exposure of U.S. military personnel to significant risk over a substantial period." *Id*.

We have found that previous military deployments did not rise to the level of a war even where the deployment was substantial. For example, the United States spent two years enforcing a no-fly zone, protecting United Nations ("UN") peacekeeping forces, and securing safe areas for civilians in Bosnia, all without congressional authorization. *See Bosnia Deployment*, 19 Op. O.L.C. at 329 & n.2 (noting the plan to deploy 20,000 ground troops to Bosnia as well as additional troops to surrounding areas in a support capacity); *see also Libya Deployment* at *9; (noting "one two-week operation in which NATO attacked hundreds of targets and the United States alone flew over 2300 sorties"). Similarly, in 1994, we approved a plan to deploy as many as 20,000 troops to Haiti. *Haiti Deployment I*, 18 Op. O.L.C. at 179 n.10. We also approved a U.S.-led air campaign in Libya in 2011 that lasted for over a week and involved the use of over 600 missiles and precision-guided munitions. *See* DoD News Briefing with Vice Adm. Gortney from the Pentagon on Libya Operation Odyssey Dawn (Mar. 28, 2011), http://archive.defense.gov/transcripts/transcript.aspx?transcriptid=4803. In none of these cases did we conclude that prior congressional authorization was necessary.

In reviewing these deployments, we considered whether U.S. forces were likely to encounter significant armed resistance and whether they were likely to "suffer or inflict substantial casualties as a result of the deployment." *Haiti Deployment I*, 18 Op. O.L.C. at 179. In this regard, we have looked closely at whether an operation will require the introduction of U.S. forces directly into the hostilities, particularly with respect to the deployment of ground troops. The deployment of ground troops "is an essentially different, and more problematic, type of intervention," given "the difficulties of disengaging ground forces from situations of conflict, and the attendant risk that hostilities will escalate." *Bosnia Deployment*, 19 Op. O.L.C. at 333. In such circumstances, "arguably there is a greater need for approval at the outset for the commitment of such troops to such situations." *Id*.

In connection with reviewing the proposed peacekeeping operations in Bosnia, we noted that U.S. forces enforcing the no-fly zone had "engaged in combat," including the destruction of three aircraft violating the no-fly ban and the downing of a fourth, and engaging Bosnian-Serb aircraft and gunners. *See Bosnia Deployment*, 19 Op. O.L.C. at 328 (also noting airstrikes in response to Serb air attacks threatening UN peacekeeping forces). We noted that the peacekeeping force would require the deployment of 20,000 ground troops to Bosnia, which would "raise[] the risk that the United States

w[ould] incur (and inflict) casualties." *Id*. at 333. Nonetheless, while "combat conceivably may occur during the course of the operation," we did not believe it was "likely that the United States [would] find itself involved in *extensive* or *sustained* hostilities." *Id*. at 332–33 (emphases added). In Somalia, we approved the introduction of U.S. combat-equipped forces to ensure the protection of noncombatant forces involved in UN humanitarian relief. *See Somalia Deployment*, 16 Op. O.L.C. at 10 ("It is also essential to consider the safety of the troops to be dispatched as requested by Security Council Resolution No. 794. The President may provide those troops with sufficient military protection to insure that they are able to carry out their humanitarian tasks safely and efficiently."). And in approving the deployment of U.S. Marines to Haiti in 2004, we noted that it was "possible that some level of violence and instability will continue." *Haiti Deployment II*, 28 Op. O.L.C. at 34 (quoting *Presidential Power*, 4A Op. O.L.C. at 194); *see also Presidential Power*, 4A Op. O.L.C. at 187 ("Operations of rescue and retaliation have also been ordered by the President without congressional authorization even when they involved hostilities."). Thus, even in cases involving the deployment of ground troops, we have found that the expected hostilities would fall short of a war requiring congressional authorization.

With these precedents in mind, we concluded that the proposed Syrian operation, in its nature, scope, and duration, fell far short of the kinds of engagements approved by prior Presidents under Article II. First, in contrast with some prior deployments, the United States did not plan to employ any U.S. ground troops, and in fact, no U.S. airplanes crossed into Syrian airspace. Where, as here, the operation would proceed without the introduction of U.S. troops into harm's way, we were unlikely to be "confronted with circumstances in which the exercise of [Congress's] power to declare war is effectively foreclosed." *Bosnia Deployment*, 19 Op. O.L.C. at 333.

Second, the mission was sharply circumscribed. This was not a case where the military operation served an open-ended goal. Rather, the President selected three military targets with the aim of degrading and destroying the Syrian regime's ability to produce and use chemical weapons. *Mattis Briefing* (statement of Secretary Mattis) ("Earlier today, President Trump directed the U.S. military to conduct operations in consonance with our allies to destroy the Syrian regime's chemical weapons research[,] development and production capability."); *id*. ("It was done on targets that we believed were selected to hurt the chemical weapons program. We confined it to the chemical weapons-type targets. We were not out to expand this. We

were very precise and proportionate."); *id*. (noting that "right now this is a one-time shot"). And the strikes were planned to minimize casualties, further demonstrating the limited nature of the operation. *See DoD Briefing* (statement of Lt. Gen. McKenzie). Those aspects both underscored the "limited mission" and the fact that the operation was not "aim[ed] at the conquest or occupation of territory nor even, as did the planned Haitian intervention, at imposing through military means a change in the character of a political régime." *Bosnia Deployment*, 19 Op. O.L.C. at 332.

Third, the duration of the planned operation was expected to be very short. In fact, the entire operation lasted several hours, and the actual attack lasted only a few minutes. *DoD Briefing* (statement of Lt. Gen. McKenzie).

Standing on its own, the attack on three Syrian chemical-weapons facilities was not the kind of "prolonged and substantial military engagement" that would amount to a war. *Libya Deployment* at *8. We did not, however, measure the engagement based solely upon the contours of the first strike. Rather, in evaluating the expected scope of hostilities, we also considered the risk that an initial strike could escalate into a broader conflict against Syria or its allies, such as Russia and Iran. *See Haiti Deployment I*, 18 Op. O.L.C. at 179 ("In deciding whether prior Congressional authorization for the Haitian deployment was constitutionally necessary, the President was entitled to take into account . . . the limited antecedent risk that United States forces would encounter significant armed resistance or suffer or inflict substantial casualties as a result of the deployment."). But the fact that there is some risk to American personnel or some risk of escalation does not itself mean that the operation amounts to a war. *See Cambodian Sanctuaries*, 1 Op. O.L.C. Supp. at 331; *Bosnia Deployment*, 19 Op. O.L.C. at 332. We therefore considered the likelihood of escalation and the measures that the United States intended to take to minimize that risk.

We were advised that escalation was unlikely (and reviewed materials supporting that judgment), and we took note of several measures that had been taken to reduce the risk of escalation by Syria or Russia. The targets were selected because of their particular connections to the chemical-weapons program, underscoring that the strikes sought to address the extraordinary threat posed by the use of chemical weapons and did not seek to precipitate a regime change. *See DoD Briefing* (statement of Ms. White) ("This operation does not represent a change in U.S. policy, nor an attempt to depose the Syrian regime. The strikes were [a] justified, legitimate and proportionate response to the Syrian regime's continued use of chemical

weapons on its own people."). The targets were chosen to minimize civilian casualties, *see Mattis Briefing* (statement of Gen. Dunford) ("[W]e did not select those that had a high risk of collateral damage, and specifically a high risk of civilian casualties."), and the strikes took place at a time that further reduced the threat to civilians, *see DoD Briefing* (statement of Lt. Gen. McKenzie) ("We also chose to strike it [at] . . . 4:00 in the morning local time, so we weren't trying to kill a lot of people on the objective, and so we struck at a different time of the day."), again reducing the likelihood that Syria would retaliate. The targets were also chosen to minimize risk to Russian soldiers, and deconfliction processes were used, two steps that reduced the possibility that Russia would respond militarily. *See Mattis Briefing* (statement of Gen. Dunford) ("[W]e specifically identified these targets to mitigate the risk of Russian forces being involved, and we used our normal deconfliction channels—those were active this week—to work through the airspace issue and so forth."). Given the absence of ground troops, the limited mission and time frame, and the efforts to avoid escalation, the anticipated nature, scope, and duration of these airstrikes did not rise to the level of a "war" for constitutional purposes.

## IV.

For the foregoing reasons, we concluded that the President had the constitutional authority to carry out the proposed airstrikes on three Syrian chemical-weapons facilities. The President reasonably determined that this operation would further important national interests in promoting regional stability, preventing the worsening of the region's humanitarian catastrophe, and deterring the use and proliferation of chemical weapons. Further, the anticipated nature, scope, and duration of the operations were sufficiently limited that they did not amount to war in the constitutional sense and therefore did not require prior congressional approval.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*